KYH
SMBL/2025R00534

1:26-mj-00780-EA to ███████

✓ ___ FILED ___ ENTERED
____ LOGGED _____ RECEIVED

1:56 pm, Apr 08 2026

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____TTD_____Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | 1:26-mj-00780-EA<br>1:26-mj-00781-EA<br>1:26-mj-00782-EA<br>1:26-mj-00783-EA |
| **OMAR GILLIAM,**<br>**STEPHEN OLIVER,**<br>**DERRELL WASHINGTON COATES,**<br>**KEVIN HARRIS, and**<br>███████ ███████ | Case No. ██████████<br><br>**Under Seal** |
| **Defendants.** | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, Eugene Theisen, Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being duly sworn, depose and state as follows:

### I.    PURPOSE OF THIS AFFIDAVIT

1.    I submit this affidavit in support of Criminal Complaints charging:

   a.    Omar GILLIAM with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of a 21 U.S.C. § 846; Trafficking in Firearms, in violation of 18 U.S.C. § 933; and Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1);

   b.    Stephen OLIVER with Distribution of and Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841; Trafficking in Firearms, in violation of 18 U.S.C. § 933; and Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1);

   c.    Derrell WASHINGTON-COATES with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of a 21 U.S.C. § 846;

   d.    Kevin HARRIS with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of a 21 U.S.C. § 846; and

   e.    ███████ ███████ with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of a 21 U.S.C. § 846.

2.    As a result of an ongoing investigation and the facts set forth in this affidavit, there is probable cause to believe that GILLIAM, OLIVER, WASHINGTON-COATES, HARRIS, and ████████ have committed the offenses detailed above and described herein.

## II.    AFFIANT BACKGROUND

3.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

4.    I have been an ATF Special Agent since 2017. I am currently assigned to the ATF Baltimore Field Division, Baltimore VI Field Office. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic Training, both located in Glynco, Georgia, for a combined period of 26 weeks. I have also received extensive training, both formal and on-the-job, related to federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.

5.    Prior to my employment with ATF, I graduated from the Uniformed Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I was also a Federal Police Officer for the Supreme Court of the United States Police Department for seven and a half years, during which time I assisted with and made arrests related to protests and other federal and local violations. I was further a member of Associate Justice Clarence Thomas's preferred dignitary protection team. I graduated from Frostburg State University with a bachelor's degree in Law and Society, with a concentration in criminal justice.

6.    As an ATF agent, I have conducted and participated in investigations concerning violations of federal firearm and controlled substance laws, and the commission of violent crimes. I

2

have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) the execution of search warrants; (d) the consensual monitoring and recording of conversations; (e) electronic surveillance through the use of pen registers; and (f) the handling, maintenance, and examination of evidence to include wireless telephones and computers.

7.      I have participated in numerous investigations targeting violent drug trafficking organizations (DTOs) operating throughout Baltimore City. I have conducted covert surveillance of suspected narcotics traffickers and violent offenders. I have interviewed defendants who have been charged for violation of Title 18 and Title 21. Through my knowledge, training, and experience, I have become familiar with the manner in which illegal firearms and narcotics are transported, stored, and distributed, and the manner in which firearms and narcotics traffickers communicate with one another.

8.      Based on my training, knowledge, and experience as a SA with the ATF, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of controlled dangerous substances. From my training, knowledge, experience, and conversations with other agents and officers, I am familiar with the manner in which illegal firearms/narcotics are transported, stored, and distributed, and the methods of payment for such. I am also familiar with the techniques employed by narcotics traffickers to keep records of their narcotics trafficking activities, to conceal proceeds of their illegal conduct, and to evade law enforcement by utilizing counter-surveillance, false identifications, and multiple means of communication and transportation.

3

9.      Based upon that training and experience, I have learned the following:

a.      Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and/or on his person. These records take various forms. Documents commonly concealed by traffickers that contain evidence of their various activities include, but are not limited to, notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders, and other papers relating to the ordering, transportation, sale, and distribution of controlled dangerous substances or other such documents that contain information that can be used to identify co-conspirators. These items are kept in locations that are considered safe by the drug traffickers, such as safety deposit boxes, residences, vehicles, and on their person, where they have ready access to them. Drug traffickers often have several residences, decreasing the likelihood of detection by law enforcement;

b.      Drug traffickers may use computers or other electronic storage media, including smart phones and/or other cellular phones, to store the types of records and documents listed in paragraph "a";

c.      Drug traffickers often have large amounts of cash, which they use to maintain and finance their narcotics business. This cash, along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities, is typically concealed in their residences or vehicles;

d.      Drug traffickers use cellular telephones, pagers, and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information;

e.      Drug traffickers commonly possess—that is on their person, in their vehicles, at their residence, and/or inside their "stash locations"—firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed;

f.      Drug traffickers commonly possess—that is on their person, in their vehicles, at their residence, and/or inside their "stash locations"—packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances;

g.      Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

4

h.      Drug traffickers will use more than one cellular phone for their drug trafficking business and often change their cellphones following the arrest of a member of their DTO or at random in order to frustrate law enforcement efforts.

10.     This affidavit is based upon evidence and information developed through surveillance, controlled purchases of fentanyl, firearms, and confidential source information. This affidavit does not contain all the information known to me regarding this investigation. I have included in this affidavit only the facts that I believe are sufficient to support a probable cause finding for the issuance of the requested search warrant. I have not, however, omitted any information that would defeat a determination of probable cause. In addition, the summaries do not include references to all statements made on the topics that are described. All quotations from recorded conversations are based upon my personal review of the recordings. This affidavit is not intended to include each, and every fact and matter observed by me or known to the Government.

III.    **PROBABLE CAUSE**

### *Background*

11.     Since August 2025, law enforcement has been investigating a drug trafficking organization (DTO), which operates in the 500 block of Sheridan Avenue in Baltimore, Maryland. As explained below, law enforcement, through confidential informants, has purchased fentanyl, heroin, cocaine base, and substances believed to be those three controlled substances, as well as four firearms from members of the DTO.[1]   The members of the DTO include: GILLIAM, HARRIS, WASHINGTON-COATES, OLIVER, and ████████

---

1 The substances purchased over the course of the investigation were submitted to the Baltimore Police Department Forensic Science and Evidence Services Division ("BPD Lab") for testing. Unless otherwise noted herein, I have not received the results from all the submissions.   I characterize substances as "suspected" when I have not received those results.   However, based on my training and experience, as well as the factual circumstances of the controlled purchases

12.     To date, there have been fifteen controlled purchases of narcotics and suspected narcotics and firearms from GILLIAM, several of which were arranged via a cellular phone assigned call number 240-705-6371 (hereinafter, *6371), which law enforcement believed is used by GILLIAM.    WASHINGTON-COATES has been present and involved with seven of the controlled purchases involving GILLIAM.    HARRIS was present and involved with one of the controlled purchases involving GILLIAM.

13.     To date, there have been eight controlled purchases of narcotics and suspected narcotics from OLIVER, several of which were arranged via a cellular telephone assigned call number 443-257-9623 (hereinafter, *9623), which law enforcement believe is used by OLIVER *9623.    Also, two separate controlled purchases of handguns from OLIVER were arranged via *9623.

14.     To date, there have been three controlled purchases of narcotics and suspected narcotics from ███████ who provided the call number for a cellular phone assigned call number ███████ (hereinafter, *███ which law enforcement believed is used b FARMET, to a confidential informant to arrange future transactions.

### The 500 Block of Sheridan Avenue

15.     Investigators determined from controlled purchases, surveillance, police reports, and information from confidential sources of information that the 500 block of Sheridan Avenue has been controlled by a violent DTO for several years.    The DTO has used and controlled several residences on the block to operate their DTO, including: 525 Sheridan Avenue, Baltimore, Maryland 21212 ("525 Sheridan"); 522 Sheridan Avenue ("522 Sheridan"), and 530 Sheridan

---

including the language used by the purchaser and seller during the transaction, I believe the substances purchased are the substances identified herein.

Avenue ("530 Sheridan"). Investigators believe that the DTO may have control of more residences within the block. Over the course of the investigation, investigators have seen members of the DTO come and go freely between residences within the block. Below is a map of the 500 block of Sheridan Avenue and 525 Sheridan, 522 Sheridan, and 530 Sheridan are marked with a red x.



*Controlled Purchases from GILLIAM, HARRIS, and WASHINGTON-COATES*

16.    In August of 2025, a confidential informant ("CI-1") began to buy narcotics from GILLIAM and other members of the DTO operating in the 500 block of Sheridan Avenue in

Baltimore, Maryland.[2]   On August 21, 2025, ATF used CI-1 to make a controlled purchase of suspected fentanyl from GILLIAM in the 500 block of Sheridan Avenue.   Investigators provided CI-1 with a GPS tracker and a recording/transmitting device so investigators could monitor and record CI-1's conversations.[3]   At approximately 4:06 p.m., CI-1 arrived in the 500 block of Sheridan Avenue.   CI-1 was greeted by GILLIAM and asked if he (GILLIAM) could provide him/her with drugs.   GILLIAM provided CI-1 with two green top vials of heroin.[4]

17.    CI-1 observed GILLIAM exit 525 Sheridan prior to providing him/her with the heroin.   GILLIAM told CI-1 that he could provide CI-1 with larger quantities of narcotics and provided the call number for *6371 to set up future sales.

18.    Since August 2025, CI-I has purchased narcotics from GILLIAM on the following days: September 9, 2025; September 17, 2025; and October 29, 2025.   The substances purchased from GILLIAM on these days were submitted to the BPD Lab.   The substances tested positive for 4-ANPP (4-Anilino-N-phenethylpiperidine), Heroin, and Fentanyl.

---

2 CI-1 has been a paid informant for the ATF since June of 2021 and has provided reliable information to law enforcement on multiple occasions in the past. Additionally, in this and prior investigations with which CI-1 assisted, much of the information provided by CI-1 has been corroborated by law enforcement through other investigative techniques such as physical surveillance, video surveillance, and the review of recordings of the controlled purchases. Specifically, CI-1's information and involvement in controlled purchases has helped further current federal investigations, and CI-1 has also provided the Baltimore Police Department with information that has led to arrests. CI-1 has participated in narcotics trafficking and is providing information to law enforcement voluntarily in exchange for monetary compensation. CI-1 has criminal convictions for felony offenses that are drug related.

3 During each controlled purchase described in this affidavit, the confidential informant was equipped with a device capable of capturing and recording audio and video.   Investigators can also listen to the controlled purchase in real time to ensure the safety of the confidential informant and the integrity of the evidence being sought.

4 The suspected fentanyl/heroin was taken to the Baltimore Police Department's Forensic Laboratory ("BPD Lab") for analysis.   The substance tested positive for heroin.

1:26-mj-00780-EA to

19.    Prior to the controlled purchase on September 17, 2025, CI-1 called GILLIAM on *6371 to verify he was in the 500 block of Sheridan Avenue.   GILLIAM told CI-1 that he/she could meet his associate in the 500 block of Sheridan Avenue to purchase the fentanyl/heroin. Later that day, when CI-1 arrived in the 500 block of Sheridan Avenue, CI-1 observed HARRIS exiting 525 Sheridan seconds prior to meeting CI-1.   HARRIS provided CI-1 with 50 orange capsules of narcotics.[5]   HARRIS told CI-1 that the drugs were the same drugs that he purchased from GILLIAM.   HARRIS told CI-1 that his name was "Kev" and he could contact GILLIAM anytime he/she needed to purchase drugs from him.

20.    In October of 2025, a second confidential informant ("CI-2") began to buy narcotics from GILLIAM and other members of the DTO.[6]   These controlled purchases occurred in the 500 block of Sheridan Avenue and elsewhere in Baltimore, Maryland.   CI-2 purchased narcotics from GILLIAM and others members of the DTO on October 15, 2025; November 10, 2025; November 20, 2025; November 26, 2025; January 13, 2026; January 22, 2026; February 3, 2026; February 10, 2026; February 18, 2026; and February 25, 2026.   After the initial purchase of narcotics from GILLIAM, GILLIAM told CI-2 that he could provide CI-2 with larger quantities of narcotics and provided *6371 to set up future sales.

---

5 The narcotics were submitted to the BPD Lab, which determined that the substance tested positive for 4-ANPP (4-Anilino-N-phenethylpiperidine), Heroin, and Fentanyl.

6 CI-2 has been a paid informant for the ATF since June of 2011 and has provided reliable information to law enforcement on multiple occasions in the past. Additionally, in this and prior investigations with which CI-2 assisted, much of the information provided by CI-2 has been corroborated by law enforcement through other investigative techniques such as physical surveillance, video surveillance, and the review of recordings of the controlled purchases. Specifically, CI-2's information and involvement in controlled purchases has helped further current federal investigations, and CI-2 has also provided the Baltimore Police Department with information that has led to arrests. CI-2 has participated in narcotics trafficking and is providing information to law enforcement voluntarily in exchange for monetary compensation. CI-2 has criminal convictions for felony offenses that are drug related.

9

21.     During the controlled purchase on November 10, 2025, GILLIAM provided CI-2 with 50 pink capsules of suspected fentanyl/heroin.   Moments later, a dark blue Cadillac sedan with a Maryland tag of 8GS4217 entered the 500 block of Sheridan Avenue and parked in front of CI -2 and GILLIAM.   The unknown individual from the Cadillac sedan provided GILLIAM with 10 pink trash can jugs of suspected cocaine base.   GILLIAM then provided CI-2 with the same 10 pink trash can jugs of suspected cocaine base and in exchange CI-2 provided GILLIAM with $500 of pre-recorded ATF agent cashier funds.[7]

22.     Investigators searched the dark blue Cadillac sedan with a Maryland tag of 8GS4217 in law enforcement databases and determined the vehicle was registered to Derrell WASHINGTON-COATES.   Investigators showed CI-2 a picture of WASHINGTON-COATES sourced from law enforcement databases and CI-2 confirmed WASHINGTON-COATES was the individual who provided GILLIAM with the cocaine base.

23.     During the controlled purchase on November 20, 2025, WASHINGTON-COATES again arrived in the dark blue Cadillac sedan with a Maryland tag of 8GS4217 and appeared to provide GILLIAM with 10 pink trash can jugs of cocaine base.   GILLIAM then provided CI-2 with the same 10 pink trash can jugs of cocaine base.

24.     During prior controlled purchases, CI-2 asked GILLIAM if he (GILLIAM) could sell firearms to him/her.   GILLIAM said that he could.   On November 20, 2025, GILLIAM told CI-2 that he was anticipating the arrival of firearms, and he would be able to provide CI-2 with a firearm.   GILLIAM later contacted CI-2 via *6371 and said that he (GILLIAM) could not provide CI-2 with a firearm.

---

7 The suspected fentanyl/heroin and suspected cocaine base were submitted to the BPD Lab for analysis. The substances tested positive for cocaine base and Heroin, 4-ANPP (4-Anilino-N-phenethylpiperidine), and Fentanyl.

10

25.     During the controlled purchase on January 13, 2026, GILLIAM provided CI-2 with a clear bag of suspected heroin.    Moments later, GILLIAM was approached by WASHINGTON-COATES.    GILLIAM told WASHINGTON-COATES that he needed cocaine base to provide CI-2.    Then, law enforcement observed WASHINGTON-COATES walk towards a Silver Chevrolet Impala Sedan bearing Maryland License Plate 3GX1730 (the "Silver Impala") and open the trunk of the vehicle.    Law enforcement observed WASHINGTON-COATES retrieve what appeared to be small objects from the vehicle's trunk.    WASHINGTON-COATES and GILLIAM then provided CI-2 with 3 green trash can jugs and one clear screw top container of suspected cocaine base.    Law enforcement believe these jugs and screw top containers were stored in the trunk of the Silver Impala.    CI-2 provided WASHINGTON-COATES and GILLIAM with $1,200 of pre-recorded ATF agent cashier funds for the narcotics.[8]

26.     During the controlled purchase on January 13, 2026, Kevin HARRIS was observed by CI-2 entering and exiting 525 Sheridan.    HARRIS joined the conversation between CI-2, GILLIAM, and WASHINGTON-COATES while the transaction was still occurring.

27.     During the controlled purchase on January 22, 2026, GILLIAM provided CI-2 with seven containers of suspected crack cocaine.    GILLIAM told CI-2 that he supplied the 500 block of Sheridan Avenue with the "raw" and they have the "fent."    Based on their training, knowledge, and experience, investigators believe GILLIAM told CI-2 that he is the supplier of heroin ("raw") to the 500 block of Sheridan Avenue and that HARRIS supplied the fentanyl ("fent").

28.     A few moments later, CI-2 observed WASHINGTON-COATES exit 525 Sheridan. WASHINGTON-COATES joined the conservation between GILLIAM and CI-2.

---

8 The suspected narcotics were submitted to the BPD Lab for analysis. The results of this analysis are pending; however, based on my training and experience as well as the facts and circumstances of the purchase, I believe that substances purchased from GILLIAM and WASHINGTON-COATES are likely to be heroin and cocaine base.

11

WASHINGTON-COATES also advised CI-2 that he is a supplier of narcotics. Law enforcement observed WASHINGTON-COATES go to the trunk of the Silver Impala. Moments later, he gave GILLIAM items he retrieved from the trunk. GILLIAM then provided CI-2 with two containers of suspected crack cocaine, which law enforcement believe was stored in the trunk of the Silver Impala and retrieved by HARRIS. CI-2 provided GILLIAM with $320 of pre-recorded ATF agent cashier funds for the suspected narcotics.[9]

29. On February 3, 2026, CI-2 purchased heroin from GILLIAM in the 3100 block of Woodring Avenue in Baltimore, Maryland. Prior to the deal, CI-2 contacted GILLIAM on *6371 to ensure GILLIAM was available to sell him/her drugs. GILLIAM confirmed he was in the 3100 block of Woodring Avenue with the drugs. At approximately 3:55 p.m., CI-2 arrived in the 3100 block of Woodring Avenue. CI-2 observed GILLIAM exit the Silver Impala driven by WASHINGTON-COATES and walk towards his/her vehicle. GILLIAM provided CI-2 with one clear bag of heroin. BPD's Lab confirmed the substance was heroin.

30. On February 10, 2026, CI-2 purchased cocaine base and fentanyl from GILLIAM and WASHINGTON-COATES at Northwood Commons Shopping Center located at 1534 Havenwood Road, Baltimore, Maryland. At approximately 2:52 p.m., CI-2 arrived at the Northwood Commons Shopping Center. CI-2 was greeted by GILLIAM and asked if he (GILLIAM) could provide him/her with drugs. GILLIAM provided CI-2 with a clear bag containing suspected fentanyl. Moments later, GILLIAM and CI-2 walked to the Silver Impala being driven by WASHINGTON-COATES. WASHINGTON-COATES provided CI-2 with four bags of suspected cocaine base. The substances purchased from GILLIAM and

---

9 The suspected narcotics were submitted to the BPD Lab for analysis. The results of this analysis are pending; however, based on my training and experience as well as the facts and circumstances of the purchase, I believe that substances purchased from GILLIAM and WASHINGTON-COATES are likely to be heroin and cocaine base.

WASHINGTON-COATES were submitted to the BPD Lab for analysis. The substances contained fentanyl and cocaine, respectively.

31.    On February 18, 2026, law enforcement observed GILLIAM exit the Silver Impala immediately prior to selling CI-2 suspected cocaine base in the 4400 block of Moravia Road

32.    On February 25, 2026, ATF used CI-2 to make a controlled purchase of cocaine base from GILLIAM and WASHINGTON-COATES at 1238 Putty Hill Avenue Towson, Maryland. Prior to the deal, CI-2 contacted GILLIAM on *6371 to ensure GILLIAM was available to sell him/her cocaine base. Prior to the controlled purchase, investigators surveilled a residence located at 133 Bourbon Court, Parkville Maryland ("133 Boubon"). The Silver Impala was in front of the residence.

33.    At approximately 12:22 pm, both GILLIAM and WASHINGTON-COATES exited 133 Bourbon and entered the Silver Impala. GILLIAM was the passenger and WASHINGTON-COATES the driver. GILLIAM and WASHINGTON-COATES departed 133 Bourbon.

34.    At approximately 1:11 p.m., CI-2 arrived at 1238 Putty Hill Avenue. CI-2 observed GILLIAM exit the Silver Impala and walk towards his/her vehicle. WASHINGTON-COATES was still operating the Silver Impala. GILLIAM provided CI-2 one clear bag of suspected cocaine base in exchange for $4,950 of pre-recorded ATF agent cashier funds.

### Controlled Purchases of Firearms from Gilliam

35.    On March 10, 2026, CI-2 purchased two firearms from GILLIAM in the 1500 block of Ralworth Road in Baltimore, Maryland. Prior to the deal, CI-2 contacted GILLIAM on *6371 to ensure GILLIAM was available to sell the firearms. GILLIAM confirmed he was in the 1500 block of Ralworth Road with the firearms.

13

36. At approximately 10:55 a.m., CI-2 arrived in the 1500 block of Ralworth Road. CI-2 entered the Silver Impala. GILLIAM provided CI-2 with one Taurus Arms Model G2c, 9mm handgun bearing serial number ACM658116 and one Keltec Model Sub-2000, .40cal rifle bearing serial number EZE66. Each firearm was test fired and determined to be operable. An ATF agent examined the firearms and determined that they traveled in interstate commerce.

37. On March 19, 2026, CI-2 purchased a firearm and crack cocaine from GILLIAM in the 500 block of Sheridan Avenue in Baltimore, Maryland. Prior to the deal, CI-2 contacted GILLIAM on *6371 to ensure GILLIAM was available to sell the firearm and crack cocaine. GILLIAM confirmed he would be in the 500 block of Sheridan with the firearm and crack cocaine.

38. At approximately 12:10 pm, investigators were conducting surveillance at 133 Bourbon. Parked in front of the location was the Silver Impala. At approximately 12:42 pm, investigators observed WASHINGTON-COATES exit 133 Bourbon to walk a dog.

39. Approximately 20 minutes later, CI-2 arrived in the 500 block of Sheridan Avenue. Moments later, GILLIAM walked from the front porch of 523 Sheridan Avenue to approach CI-2. At the same time, OLIVER was observed exiting a Silver Nissan Altima. Investigators believe that the Silver Altima was an Uber/Lyft ride share vehicle. OLIVER then walked onto the porch at 523 Sheridan Avenue. GILLIAM told CI-2 he did not possess the firearm discussed for sale earlier, but the individual would be back later in the day with the firearm.

40. At approximately 1:06 pm, GILLIAM entered 525 Sheridan. At approximately 1:08 pm, GILLIAM exited 525 Sheridan and provided CI-2 with eight (8) clear bags of suspected crack cocaine. GILLIAM and CI-2 agreed to meet later in the day for the firearm transaction.

41. At approximately 4:21 pm, CI-2 arrived in the 500 block of Sheridan Avenue. Moments later, GILLIAM entered CI-2's vehicle and they drove to the corner of Ready Avenue

14

and Sheridan Avenue.   GILLIAM provided CI-2 with a white bag containing a Browning Hi-Power Model 2W5, .40 caliber handgun bearing serial number 2W5NT51293.   The firearm was test fired and determined to be operable.   An ATF agent examined the firearm and determined it traveled in interstate commerce.

### Controlled Purchases of Narcotics and Firearms from OLIVER

42.    On December 11, 2025, CI-2 purchased cocaine base from OLIVER in the 500 block of Sheridan Avenue.   At approximately 12:44 p.m., CI-2 arrived and was greeted by OLIVER and asked if he (OLIVER) could provide him/her with drugs.   OLIVER confirmed that he could provide CI-2 with drugs.   OLIVER was observed entering and exiting 522 Sheridan after the initial meet with CI-2.   OLIVER provided CI-2 with two clear bags of cocaine base, as confirmed by BPD Lab analysis.   During the transaction, OLIVER provided CI-2 with *9623 to facilitate future deals.

43.    On December 18, 2025, CI-2 purchased additional cocaine base from OLIVER. At approximately 2:57 p.m., CI-2 arrived in the 500 block of Sheridan Avenue.   CI-2 was greeted by OLIVER and asked if he (OLIVER) could provide him/her with drugs.   OLIVER confirmed that he could provide CI-2 with drugs.   OLIVER was observed entering and exiting 522 Sheridan after the initial meet with CI-2.   Then, OLIVER provided CI-2 with a clear bag of cocaine base. OLIVER again provided CI-2 with *9623 to facilitate future deals.   CI-2 asked OLIVER if he could provide him/her a firearm.   OLIVER said he could provide a firearm in about an hour.

44.    CI-2 departed the 500 block of Sheridan Avenue enroute to investigators. While enroute, CI-2 was contacted by OLIVER from *9623 stating he had the firearm for sale.

45.    At approximately 3:30 p.m., CI-2 returned to the 500 block of Sheridan Avenue. OLIVER again was observed entering and exiting 522 Sheridan after seeing CI-2 arrive.

15

OLIVER provided CI-2 with a blue Walmart bag containing a Springfield Armory handgun, model XDS, 9mm handgun bearing serial number S4934631 loaded with eight rounds of 9mm ammunition. The firearm was test fired and determined to be operable. An ATF agent examined the firearm and determined it traveled in interstate commerce. The spent casing from the test fire was input into the NIBIN database to be compared for potential leads.[10] It was determined that the Springfield Armory handgun had a lead, it was used in the homicide of Jonus Ben on October 12, 2021.

46. On January 6, 2026, and January 8, 2026, CI-2 purchased cocaine base, as confirmed by BPD Lab's analysis, from OLIVER in the 500 block of Sheridan Avenue. On January 13, 2026, CI-3 purchased cocaine base, as confirmed by BPD Lab analysis, from OLIVER in the 500 block of Sheridan Avenue.[11] OLIVER provided CI-3 with the call number for *9623 to facilitate future deals. OLIVER told CI-3 his name was "DEW".

47. On February 3, 2026, CI-2 purchased cocaine base and firearm from OLIVER at the corner of Winston Avenue and Saint Georges Avenue in Baltimore, Maryland. At approximately 12:58 pm, ATF pole cam operator observed OLIVER enter the 500 block of Sheridan Avenue driving a White Jeep Cherokee SUV bearing Maryland License Plate 6GM7016 (the "White Cherokee"). Moments later, OLIVER exited the White Jeep and walked in the direction of 515 Sheridan Avenue. OLIVER then walked in the direction of 522 Sheridan.

---

10 The National Integrated Ballistic Information Network ("NIBIN") is used to compare images of submitted ballistic evidence from shooting scenes and recovered firearms and produces a list of possible similar results.

11 CI-3 has been a paid informant for the BPD since 2019 and has provided reliable information to law enforcement on multiple occasions in the past. Additionally, in this and prior investigations with which CI-3 assisted, much of the information provided by CI-3 has been corroborated by law enforcement through other investigative techniques such as physical surveillance and video surveillance. Specifically, CI-3's information and involvement in controlled purchases has helped further current federal investigations, and CI-3 has also provided the Baltimore Police Department with information that has led to arrests. CI-3 has participated in narcotics trafficking and is providing information to law enforcement voluntarily in exchange for monetary compensation. CI-3 has criminal convictions for felony offenses that are drug related

16

48.     At approximately 1:03 pm, OLIVER was observed exiting 522 Sheridan and walking back in direction of 515 Sheridan Avenue.   515 Sheridan Avenue was out of the view of the camera being operated by investigators.

49.     At approximately 1:10 p.m., CI-2 arrived at the corner of Winston Avenue and Saint Georges Avenue.   CI-2 entered the White Jeep being operated by OLIVER.   OLIVER provided CI-2 with an Astra model A75, .40 caliber handgun, bearing serial number 7238A, loaded with one round of .40 ammunition and three bags of cocaine base.   The suspected cocaine base was tested by the BPD Lab.   The substances tested positive for cocaine base.

50.     The firearm purchased from OLIVER was test fired and input into the NIBIN database to be compared for potential leads.   It was determined that the Astra handgun had a lead, it was used in the homicide of Michael Ramseur on January 30, 2026.   This homicide occurred in the 500 block of Sheridan Avenue.

51.     On February 10, 2026, and February 18, 2026, CI-2 made additional purchases of cocaine base and suspected cocaine base, respectively, from OLIVER.   The controlled purchase on February 10, 2026, took place in the White Jeep.

### Controlled Purchases of Narcotics from █████

52.     On January 22, 2026, CI-2 contacted GILLIAM on *6371 to tell him that he/she was in the 500 block of Sheridan Avenue to purchase drugs.   GILLIAM told CI-2 that his associate would meet CI-2 in the 500 block of Sheridan Avenue to provide him with drugs.   GILLIAM told CI-2 that the associates name was "█████   At approximately 11:07 a.m., CI-2 arrived in the 500 block of Sheridan Avenue and observed GILLIAM's associate exit 525 Sheridan.   The associate approached CI-2 and confirmed that he was GILLIAM'S associate "█████   While watching the live feed investigators were able to identify "███ as █████

17

█████ escorted CI-2 into 530 Sheridan and provided CI-2 with fifteen containers of suspected crack cocaine. During this transaction, and while in 530 Sheridan, CI-2 observed what appeared to be an assault style rifle inside a kitchen cabinet that was in close proximity to █████ and other narcotics being sold.

53.      █████ provided CI-2 with *█ to facilitate future purchases. A short time later, CI-2 called █████ on *█ CI-2 asked █████ if he had any fentanyl/heroin that he could provide CI-2. █████ acknowledged that he had more drugs that he could provide. CI-2 returned to the 500 block of Sheridan Avenue and █████ again escorted CI-2 into 530 Sheridan and provided CI-2 with twenty containers of suspected heroin/fentanyl.

54.      At approximately 12:04 pm, investigators observed HARRIS retrieve a bag from the trunk of a Silver Volkswagen Jetta Sedan bearing Maryland License Plate 9GN0336 (the "Silver Jetta") and enter 530 Sheridan. Investigators believe HARRIS was bringing more drugs into the residence. Moments later, HARRIS exited 530 Sheridan. Investigators have observed HARRIS operate the Silver Jetta on several occasions in the 500 block of Sheridan Avenue. Over the course of the investigation, investigators have observed HARRIS and other members of the DTO use vehicles to store narcotics. I know that it is common for narcotics traffickers to store their narcotics in bags and other containers to prevent law enforcement and others from observing them transporting narcotics.

55.      On February 18, 2026, CI-2 contacted █████ on *█ to coordinate a deal for the sale of drugs. █████ told CI-2 that he is no longer in that area because he was robbed by the DTO operating in the 500 block of Sheridan Avenue. █████ also advised CI-2 that "Dew" tore his people up. Investigators believe that █████ is referring to OLIVER as "Dew"

18

because OLIVER has told CI-2 and CI-3 that "Dew" is his name.   Investigators also believe that "Dew tore his people up" is referring to the murder that occurred on January 30, 2026.

56.   On March 4, 2026, CI-2 purchased cocaine from ▆▆▆▆ in the 500 block of Sheridan Avenue.   During the deal, CI-2 contacted GILLIAM on *6371 to tell him that he/she was in the 500 block of Sheridan Avenue to purchase drugs.   GILLIAM told CI-2 that ▆▆▆▆ would meet him/her in the 500 block of Sheridan Avenue to provide drugs.   GILLIAM advised CI-2 that ▆▆▆▆ would pay him a portion of the proceeds from the transaction to facilitate the deal.

57.   At approximately 10:39 a.m., CI-2 arrived in the 500 block of Sheridan Avenue and was approached by ▆▆▆▆ ▆▆▆▆ provided CI-2 with nineteen containers of suspected crack cocaine.

### GILLIAM'S and OLIVER's Prohibited Status

58.   A criminal history check was completed on GILLIAM and OLIVER.   On July 11, 2025, GILLIAM was convicted in the Baltimore City Circuit Court of CDS: Possession With the Intent to Distribute.   GILLIAM was sentenced to five years in prison with all but two days sentence suspended, followed by three years of supervised probation.   On July 1, 2004, OLIVER was convicted by the Baltimore City Circuit Court of Handgun on Person.   OLIVER was sentenced to two years in prison with one year and eight months suspended, followed by three years of supervised probation.   Given these sentences, I believe that GILLIAM and OLIVER know that they have been convicted of a crime punishable by more than one year.

59.   Based upon the foregoing, I believe there is probable cause that:

19

1:26-mj-00780-EA to

a. GILLIAM, WASHINGTON-COATES, HARRIS, and ▮▮▮ have violated 21 U.S.C. § 846, that is Conspiracy to Distribute and Possess with Intent to Distribute;

b. OLIVER has violated 21 U.S.C. § 841, that is Distribution of and Possession with Intent to Distribute Controlled Substances; and

c. GILLIAM and OLIVER have violated 18 U.S.C. § 922(g)(1), that is Possession of a Firearm by a Prohibited Person; and 18 U.S.C. § 933, that is Firearms Trafficking.

## CONCLUSION

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue criminal complaints and arrest warrants for Omar GILLIAM, Stephen OLIVER, Derrell WASHINGTON-COATES, Kevin HARRIS, and ▮▮▮

**EUGENE THEISEN** Digitally signed by EUGENE THEISEN
Date: 2026.04.01 15:48:23 -04'00'

Eugene Theisen
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___2nd___ day of April 2025.

The Honorable Erin Aslan
United States Magistrate Judge
District of Maryland

20